# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| DAPHNE FERRELL,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY INC.,<br><br>Defendant. | COMPLAINT & JURY DEMAND<br><br>CIVIL ACTION NO: 2:26-cv-04370 |

## DIRECT FILING ORDER AND VENUE

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, and privileges, and obligations of the Direct Filing Order and other Orders of the Court.  Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Southern District of Mississippi as Plaintiff's venue ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_X_ Plaintiff currently resides in Biloxi, Mississippi.

_X_ Plaintiff purchased and used Defendant(s)' products in Biloxi, Mississippi.

__ The Original Venue is a judicial district in which Defendant Eli Lilly and Company Inc.

1

reside, and all Defendant are residents of the State in which the district is located (28 U.S.C. § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 U.S.C. § 1391(b)(2)):

__ There is no district in which an action may otherwise be brought under 28 U.S.C. § 1391, and the Original Venue is a judicial district in which Defendant Eli Lilly and Company Inc. is subject to the Court's personal jurisdiction with respect to this action (28 U.S.C. § 1391(b)(3)).

__ Other reason (please explain): _____.

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff, DAPHNE FERRELL, by and through the undersigned counsel, and brings this complaint against Defendant Eli Lilly and Company Inc. (hereinafter "Eli Lilly and Company Inc."), for damages suffered by Ms. Ferrell who was severely injured as a result of Defendant's widespread marketing of its drug Trulicity, and her subsequent use of Trulicity, an injectable prescription medication that is approved for improvement of blood sugar (glucose) in adults with type 2 diabetes and weight loss, and alleges as follows:

### PARTIES

1.    At all relevant times hereto, Plaintiff DAPHNE FERRELL was a resident and citizen of the state of Mississippi in the county of Harrison.

2.    Plaintiff was prescribed and took Trulicity as directed by her physicians.

3.    As a result of her use of Trulicity, Ms. Ferrell developed non-arteritic anterior ischemic optic neuropathy (NAION) of her left and right eyes and suffers severe physical and emotional injuries and radical changes to her lifestyle given her severe loss of sight.

4.    Eli Lilly and Company Inc. ("Eli Lilly") is an Indiana corporation that has its principal place of business at 893 S Delaware St, Indianapolis, IN 46225.

5.    Defendant Eli Lilly and Company Inc. is a publicly traded company owned mostly by Lilly Endowment Inc.

6.    Eli Lilly is the manufacturer of Trulicity.

7.    Upon information and belief, Defendant failed to warn physicians and the end users of Trulicity of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

8.    Upon information and belief, Defendant failed to warn the end users of Trulicity of the complications and devastating effects of which the company knew or should have known.

9.    Upon information and belief, Defendant's marketing was deceptive and misleading about the true risks associated with Trulicity, risks which the companies knew or should have known.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of Mississippi and each Defendant is neither incorporated nor has its principal place of business in the State of Mississippi.

11.    This Court has personal jurisdiction over Defendant consistent with the United States Constitution and 42 Pa. Consol. Stat. Ann. §5322 (Pennsylvania's "long arm" statute), as Plaintiff's claims arise out of Defendant's transaction of business, their tortious acts within the Commonwealth of Pennsylvania, their doing a series of similar acts for the purpose of thereby

realizing pecuniary benefit, and by virtue of Defendant's substantial, continuous, and systematic contacts with the Commonwealth of Pennsylvania.

12.     This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendant routinely markets their products at issue in this District and conducts business in this District related to their products at issue in the state of Mississippi. Venue is further proper as Plaintiff is a resident of Mississippi, was prescribed Defendant's product in the state of Mississippi, and it is where her injury and subsequent treatment has occurred.

## BACKGROUND

### I. The Development and Approval of Trulicity and Mounjaro

14.     GLP-1s were developed long before Novo Nordisk's Ozempic.

15.     On or about September 18, 2014, Trulicity, whose active ingredient is dulaglutide, was approved by the FDA.[1]

16.     At the time of its approval, Trulicity was indicated for the treatment of improving glycemic control in adults with Type 2 diabetes.

17.     At the time of its approval, Trulicity was the first GLP-1RA that followed a once weekly dosing regimen.

---

[1] https://investor.lilly.com/news-releases/news-release-details/fda-approves-trulicitytm-dulaglutide-lillys-once-weekly-therapy

18.    Following the success of Eli Lilly's Trulicity and Novo Nordisk's Ozempic, scientists and other pharmaceutical companies began exploring the possibilities of combining GLP-1s with other compounds.

19.    In the early 2010s, a team of scientists at Indiana University created tirzepatide, Mounjaro's active ingredient, by combining GLP-1 and GIP into single molecules. [2]

20.    GIP stands for glucose-dependent insulinotropic polypeptide. It is a natural hormone that works alongside GLP-1 to help control blood sugar and promote weight loss by signaling the pancreas to release insulin, slow stomach emptying, and increase feelings of fullness.[3]

21.    In pre-clinical trials, obese rats given tirzepatide were observed to decrease their food intake, decrease their body weight and improve their glucose tolerance. [4]

22.    Rats given tirzepatide were more likely to develop thyroid C-cell tumors. The offspring of pregnant rats given tirzepatide had fetal abnormalities. [5]

23.    From 2018 to 2021 Eli Lilly conducted clinical trials collectively known as SURPASS. [6]

---

[2] https://newatlas.com/triple-agonist-peptide-diabetes-obesity/35180/#:~:text=In%202012%2C%20we%20covered%20work%20led%20by,held%20promise%20as%20a%20treatment%20for%20obesity (last visited on Dec. 15, 2025).
[3] https://phelpshealth.org/news/featured-stories/understanding-mounjaro-guide-type-2-diabetes-patients#:~:text=A%20delicate%20balance:%20Glucagon%20is,the%20pancreas%20to%20release%20insulin (last visited on Dec. 15, 2025)
[4] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000PharmR.pdf (last visited on Dec. 15, 2025)
[5] https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215866s000lbl.pdf (last visited on Dec. 15, 2025)
[6] https://diabetes.org/newsroom/latest-data-from-SURPASS-trials-demonstrate-tirzepatide-provided-blood-sugar-reductions-weight-loss#:~:text=Blood%20Sugar%20Reductions-,Latest%20Data%20From%20SURPASS%20Trials%20Demonstrate%20Tirzepatide%20Provided%20Meaningful%20Blood,with%20a%20test%20called%20A1C (last visited on Dec. 15, 2025)

24.    From 2019 to 2023, Eli Lilly conducted five additional clinical trials collectively known as SURMOUNT to test the effectiveness, safety, and long-term benefits of tirzepatide for chronic weight management in adults with obesity. [7]

25.    The final trial, SURMOUNT-5, compared tirzepatide to Wegovy.[8]

26.    Eli Lilly was already testing the drug's effectiveness for chronic weight management before it had been approved for Type 2 diabetes. Eli Lilly submitted a new drug application (NDA 215866) for tirzepatide under their brand name Mounjaro on September 15, 2021. [9]

27.    The FDA approved Mounjaro on May 13, 2022 for the regulation of type 2 diabetes.[10]

28.    Eli Lilly continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

29.    The FDA's approval was based on the first nine SURPASS and SURMOUNT trials.[11]

30.    In a news release dated May 13th, 2022, Eli Lilly reported that "While not indicated for weight loss, Mounjaro led to significantly greater weight reductions versus comparators in a key secondary endpoint." [12]

---

[7] https://www.lilly.com/en-CA/news/press-releases/2024.12.4-tirzepatide-surmount-5-h2h
[8] *Id.*
[9] https://www.govinfo.gov/content/pkg/FR-2024-02-29/html/2024-04157.htm (last visited on Dec. 15, 2025)
[10] https://www.fda.gov/drugs/drug-approvals-and-databases/drug-trials-snapshots-mounjaro#:~:text=MOUNJARO%20(tirzepatide),How%20is%20this%20drug%20used (last visited on Dec. 15, 2025)
[11] *Id.*
[12] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)

31.    In a news release dated October 6th, 2022, the president of Lilly Diabetes, Mike Mason, stated "[o]besity is a chronic disease that impacts the health of nearly 100 million Americans and is a significant driver of healthcare costs… we are dedicated to helping people living with obesity through our research and development of innovative treatments like tirzepatide, which produced significant weight reductions in patients taking tirzepatide for type 2 diabetes in SURPASS." [13]

32.    Eli Lilly acknowledges that Mounjaro is not a weight loss medication but simultaneously advertised its weight loss capabilities before the active ingredient, tirzepatide, was approved for chronic weight management by the FDA. [14]

33.    On October 6th, 2022, the FDA granted Fast Track designation for the investigation of tirzepatide for the treatment of obese adults or overweight adults with weight-related comorbidities. [15]

34.    On November 17th, 2022, Eli Lilly and Co. initiated a rolling submission for their Zepbound NDA (NDA 217806). **[16]**

35.    The FDA dated and received the NDA on May 8th, 2023. [17]

36.    The FDA approved tirzepatide under Eli Lilly's brand name Zepbound on November 8th, 2023 for chronic weight management in adults with obesity or adults who are overweight with at least one weight-related condition. [18]

---

[13] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)

[14] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)

[15] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)

[16] *Id.*

[17] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/217806Orig1s000ltr.pdf (last visited on Dec. 15, 2025)

[18] FDA Approves New Medication for Chronic Weight Management | FDA (last visited on Dec. 15, 2025)

37.     According to a November 19th, 2025 summary of risk management plan released by Eli Lilly, patients with a history of proliferative diabetic retinopathy, nonproliferative diabetic retinopathy, and diabetic maculopathy were excluded from the tirzepatide clinical trial development program. [19]

38.     On their website, Defendant Eli Lilly does disclose important safety information and provides a link to their medication guide and prescribing information. However, Defendant Eli Lilly does not specify NAION or permanent vision loss as a risk when taking tirzepatide for either diabetes management or weight management. [20]

## II.     Eli Lilly Aggressively Marketed and Promoted Trulicity Mounjaro

39.     Eli Lilly began marketing Trulicity to its United States customers in late 2014[21].

40.     One of its first marketing programs was entitled "Activate Your Within."

41.     Through this campaign, Eli Lilly touted Trulicity for its once-weekly injection and allowing patients to maintain their current lifestyle with a once weekly injection.[22]

42.     Eli Lilly launched a digital campaign for Mounjaro in January of 2023. [23]

---

[19] file:///C:/Users/avillarreal/Downloads/tirzepatide_MounjaroRMPsummary_v1point0%20(1).pdf (last visited on Dec. 15, 2025)

[20] https://mounjaro.lilly.com/how-to-use-mounjaro?gclsrc=aw.ds&gad_source=1&gad_campaignid=23012920200&gbraid=0AAAAAoh_8M_T4v4msb1HY-OSnC7n5uqu4&gclid=EAIaIQobChMIvby4gdq4kQMVT0tHAR0fTAUgEAAYASAAEgLp4_D_BwE (last visited on Dec. 15, 2025)

[21] https://investor.lilly.com/news-releases/news-release-details/fda-approves-trulicitytm-dulaglutide-lillys-once-weekly-therapy

[22] https://www.trendhunter.com/trends/activate-your-within

[23] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/#:~:text=Mounjaro%20received%20US%20Food%20and,FDA's%20fast%20track%20approval%20pathway (last visited on Dec. 15, 2025)

43.     On February 12, 2023, the same day as the SuperBowl LVII, Defendant Eli Lilly aired a 75-second advertisement for Mounjaro on FOX titled "What If?". [24]

44.     This advertisement kicked off a commercial campaign that included at least seven other commercials, two of which featured Olympic athlete Simone Biles. [25] [26]

45.     In March of 2023, Eli Lilly spent $21.4 million on Mounjaro TV advertisements, placing it in the top five of pharmaceutical companies who spent the most on TV advertisements for that month. [27]

46.     An advertisement aired as part of their "What If" series, indicated that "Mounjaro is not a weight loss drug" in small font at the bottom of the screen, but also clearly indicated that Mounjaro can help decrease how much food you eat. [28]

47.     In May of 2025, Eli Lilly launched a marketing campaign titled "Duets for Type 2 Diabetes" featuring *Modern Family* actor Eric Stonestreet. [29]

48.     As part of their paid partnership, a promotional video was released on May 2nd, 2025 featuring the actor and his mother who both have Type 2 diabetes and take Mounjaro. [30]

49.     In this video, Eric Stonestreet referred to Mounjaro as a "teammate" that helped him manage his type 2 diabetes and related symptoms. [31]

---

[24] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if#:~:text=More%20Mounjaro%20Commercials-,Mounjaro%20TV%20Spot%2C%20'I%20See%20You'%20Featuring%20Simone%20Biles,Mounjaro%20TV%20Spot%2C%20'Bridge (last visited on Dec. 15, 2025)

[25] https://www.ispot.tv/ad/BkSt/mounjaro-i-see-you-featuring-simone-biles (last visited on Dec. 15, 2025)

[26] https://www.ispot.tv/ad/6mcG/mounjaro-olympics-working-hard-featuring-simone-biles (last visited on Dec. 15, 2025)

[27] https://www.fiercepharma.com/marketing/eli-lillys-new-tv-spot-diabetes-med-mounjaro-leaps-top-dtc-ad-spenders-list (last visited on Dec. 15, 2025)

[28] https://www.ispot.tv/ad/fWgz/mounjaro-what-if (last visited on Dec. 15, 2025)

[29] https://mounjaro.lilly.com/duets (last visited on Dec. 15, 2025)

[30] *Id.*

[31] *Id.*

50.     Stonestreet also stated that they participated in the paid partnership because they wanted to inspire others to talk to their doctors about Mounjaro. [32]

51.     On April 11, 2023, the New York Times reported that some research has found that "Mounjaro may be even more powerful than either Ozempic or Wegovy." It also reported that "many people [are] using it off-label to lose weight." [33]

52.     Although a representative from Eli Lilly denied promoting or encouraging "the off-label use of any of [their] medicines," Eli Lilly was clearly interested in using tirzepetide for chronic weight management. [34]

53.     In March 18th of 2024, Oprah Winfrey hosted a television special titled "An Oprah Special: Shame, Blame, and the Weight Loss Revolution" where she was joined by representatives from Eli Lilly and Novo Nordisk who discussed their respective weight loss medications. [35]

54.     This special featured Dr. W. Scott Butsch and Dr. Amanda Velazquez who are both paid consultants and have received research funding from Eli Lilly. The video also features Rhonda Pacheco, Group Vice President of Diabetes and Obesity for Eli Lilly. [36]

55.     Subsequently, the FDA issued a warning letter to both Defendants for their misleading drug advertisements determining that the media was false or misleading. [37]

---

[32] *Id.*

[33] https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes html (last visited on Dec. 15, 2025)

[34] *Id.*

[35] https://www.fiercepharma.com/marketing/oprah-shines-her-star-power-glp-1s-new-weight-loss-drugs-tv-special#:~:text=When%20Winfrey%20asked%20why%20coverage,ABC%20to%20support%20the%20broadcast (last visited on Dec. 15, 2025)

[36] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 (last visited on Dec. 15, 2025)

[37] *Id.*

56.     In the letter, the FDA claimed that both Defendants discussed the benefits of their medications while omitting or understating the risks associated with these medications and the warnings associated with each drug. [38]

57.     In early 2024, Eli Lilly launched a campaign titled "Get Better" with a new focus on obesity. [39]

58.     They aired two films showcasing their "point of view around obesity—emphasizing [their] commitment to patients by highlighting the seriousness of this disease and the appropriate use of anti-obesity medicines." [40]

59.     The second film, titled "Big Night" was released in March of 2024 during the Oscars. [41]

60.     They have also invested in a branding campaign titled "A Medicine Company" intended to strengthen Eli Lilly's brand as a company that values "health above all" and as a pharmaceutical company that can be trusted. [42]

61.     Lina Polimeni, chief corporate brand officer at Eli Lilly stated "[p]eople understand Lily as a manufacturer of medicine, but don't always understand Lilly as a company or as a brand." Also, "[t]here's a big effort happening right now in building a brand that people love and trust — one that explains why we make medicine for people and tackle diseases that are so hard to treat."[43]

---

[38] https://www.pharmexec.com/view/fda-warning-letters-novo-nordisk-eli-lilly-hims-regarding-misleading-advertising (last visited on Dec. 15, 2025)

[39] https://investor.lilly.com/news-releases/news-release-details/lillys-newest-phase-get-better-campaign-challenges (last visited on Dec. 15, 2025)

[40] *Id.*

[41] https://www.youtube.com/watch?v=lZ3Dt74R4ak, https://www.youtube.com/watch?v=zQWk-Q3tmkE (last visited on Dec. 15, 2025)

[42] https://www.adweek.com/brand-marketing/eli-lillys-big-task-become-a-loved-and-trusted-pharma-brand/ (last visited on Dec. 15, 2025)

[43] https://www.campaignlive.com/article/lilly-building-brand-people-trust/1893652 (last visited on Dec. 15, 2025)

62.     According to open payments data, Eli Lilly spent $7,745,971.25 on marketing/consulting/travel/food and beverage/etc. to physicians or medical institutions in 2024 alone. [44]

63.     In 2023, they spent $6,136,076.18 on the same. [45]

64.     Eli Lilly has spent money on grants to various hospitals like the Tufts Medical Center to whom they gave $250 million dollars. [46]

65.     By the end of 2022, Mounjaro had sales of $482.5 million. In 2023, its first full year on the market, Mounjaro brought in nearly $5.2 billion. [47]

66.     On December 18th, 2023 Global Data reported that based on clinical data, sales for Mounjaro are forecasted at $27 billion by 2029. [48]

67.     In 2024, Mounjaro was rated the ninth most sold drug, generating $11,540,100,000 dollars in sales. [49]

68.     Eli Lilly spent approximately $8,593,800,000 dollars on marketing, selling, and administrative expenses in 2024. [50]

69.     They spent $7,403,100,000 dollars on the same in 2023. [51]

---

[44] https://openpaymentsdata.cms.gov/company/100000000088 (last visited on Dec. 15, 2025)
[45] *Id.*
[46] *Id.*
[47] https://www.pewresearch.org/short-reads/2024/03/21/as-obesity-rates-rise-in-the-us-and-worldwide-new-weight-loss-drugs-surge-in-popularity/ (last visited on Dec. 15, 2025)
[48] https://www.globaldata.com/media/pharma/obesity-drug-mounjaro-to-surpass-ozempic-with-27-billion-sales-in-2029-forecasts-globaldata/ (last visited on Dec. 15, 2025)
[49] https://www.drugdiscoverytrends.com/2024s-blockbusters-top-50-pharmaceuticals-by-sales/ (last visited on Dec. 15, 2025)
[50] https://www.statista.com/statistics/517713/eli-lilly-marketing-expenses/?srsltid=AfmBOooh4INZhImNQmWYuAN77jRyz_imlJeTdp6nMNFxZxJlCzXDDPgH (last visited on Dec. 15, 2025)
[51] Id.

70. By the second quarter of 2025, Mounjaro had surpassed Ozempic in sales at over $5 million. [52]

71. Mounjaro has experienced the highest monthly gross sales post-launch compared to some other GLP-1 RAs including Ozempic. As of September 13th, 2025, Mounjaro was producing around $3 billion a month for Eli Lilly. [53]

72. A November 6, 2025 article published in the scientific journal *Nature* stated that tirzepatide was on track to be the top selling drug in the world in 2025. [54] [55]

73. Eli Lilly serves on the board and/or provides direct financial contributions to many public health advocacy groups, including the Obesity Action Coalition. [56]

74. Eli Lilly and Novo Nordisk are members of the Obesity Medicine Association's Corporate Council. [57]

75. They are platinum members of this council, meaning they contribute more than $100,000 annually to the coalition's general operating efforts. [58]

76. Eli Lilly has been a contributing supporter to the coalition since 2020, before any of its drugs were approved for weight loss. [59]

77. In sum, Defendant Eli Lilly promoted the safety, efficacy, and sale of Mounjaro in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity

---

[52] https://www.drugdiscoverytrends.com/top-25-drugs-by-sales-2025-h1/ (last visited on Dec. 15, 2025)
[53] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)
[54] https://www.nytimes.com/2025/11/21/health/eli-lilly-one-trillion-value-pharmaceuticals html (last visited on Dec. 15, 2025)
[55] https://www.nature.com/articles/d41573-025-00183-y (last visited on Dec. 15, 2025)
[56] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[57] https://obesitymedicine.org/resources/vendor-directory/ (last visited on Dec. 15, 2025)
[58] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[59] *Id.*

partnerships, telehealth partnerships, key opinion leaders, and through other public outlets and has never disclosed NAION resulting in permanent vision loss as a risk of the medication.

78.    On May 24th, 2024 the Wall Street Journal reported that Eli Lilly spent $5.3 billion to boost manufacturing capacity for Zepbound and Mounjaro to ease shortages of the drugs. They referred to this investment as the "largest manufacturing investment in company history." [60]

79.    Eli Lilly has integrated with numerous other telehealth companies like Noom to provide their weight loss medications to consumers. [61]

### III.    Marketing Works: Eli Lilly's Rampant Promotion Resulted in Thousands of Prescriptions and Billions in Sales.

80.    As a result of Defendant Eli Lilly's all-encompassing advertising and promotion efforts, Mounjaro is widely prescribed throughout the United States.

81.    Millions of Americans have been prescribed Mounjaro since its 2022 FDA approval, though exact prescription rates or current user numbers are unavailable due to discontinuations and access barriers. [62]

82.    By 2023, the rate of Mounjaro prescribing had increased by 0.4% from the previous year and by 2024 it increased by 0.8%. [63]

83.    By 2023, semaglutide and Mounjaro made up 70% of all spending done by Americans on GLP-1 RAs. [64]

---

[60] https://www.wsj.com/health/pharma/eli-lilly-boost-supply-mounjaro-zepbound-weight-loss-drugs-d7060ef2?gaa_at=eafs&gaa_n=AWEtsqdNL_RPuCMGNGxal7XO8X0aJVT9G4xcB5jz9Yr3L1CJIzAf7D_JXWXO&gaa_ts=693c66db&gaa_sig=dx015W7HoeMCEOSZjtohKvIc-GkaYbXZO4wA9R9OtaeXQvezsUnWJOM5LQeLSitjn0A6BiJOYhYPR61lLGJevQ%3D%3D (last visited on Dec. 15, 2025)

[61] https://www.noom.com/in-the-news/noom-to-streamline-access-to-zepbound-vials-with-noom-glp-1-companion-through-integration-with-lillydirect-pharmacy-provider/?srsltid=AfmBOopZtRpDqDtHAkAvdIhz2i5v-GhSGkaLJWMWQuDZCDL-Jy-VNnNh (last visited on Dec. 15, 2025)

[62] https://www.fellahealth.com/guide/how-many-people-are-on-tirzepatide#:~:text=11,to%20discontinuations%20and%20access%20barriers (last visited on Dec. 15, 2025)

[63] https://www.truveta.com/blog/research/glp1-prescription-trends-december-2024#:~:text=%2C%20or%20unknown).-,Overall%20prescribing%20trends,semaglutide%20(sold%20as%20Wegovy) (last visited on Dec. 15, 2025)

[64] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2832114 (last visited on Dec. 15, 2025)

14

84.    Following the approval of Zepbound, tirzepatide prescriptions increased from 1.1 million to 1.4 million monthly prescriptions by February 2024. [65]

85.    During December 2024, overall prescribing rates of anti-obesity medication was highest for tirzepatide. [66]

86.    A 2024 study estimated that Mounjaro's use grew by more than 250% each month in its first year of release, despite only being available for seven out of 12 months that year. [67]

87.    Just three years post-launch, Mounjaro reached an average of 9 patients per provider.[68]

88.    Since 2022 the amount of providers prescribing Mounjaro and the ratio of prescribed patients to prescribers has been increasing steadily. [69]

**IV.    Use of Trulicity and Mounjaro has been linked to the development of NAION**

89.    Defendant Eli Lilly knew or should have known of the risk of NAION with use of Trulicity.

90.    Defendant conducted clinical trials and has access to case reports and medical literature that provide them with superior knowledge compared to the general public as to the potential risks of their medications.

91.    Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

92.    It falls within the category of an eye stroke.

---

[65] https://pmc ncbi nlm nih.gov/articles/PMC11780480/ (last visited on Dec. 15, 2025)
[66] https://www.medrxiv.org/content/10.1101/2025.03.06.25323524v1 (last visited on Dec. 15, 2025)
[67] https://www.singlecare.com/blog/news/mounjaro-statistics-2025/ (last visited on Dec. 15, 2025)
[68] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)
[69] *Id.*

93.     While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

94.     "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[70]

95.     Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[71]

96.     Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[72]

97.     The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[73]

98.     Unfortunately, there is no effective treatment for NAION. Vision may worsen in the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[74]

99.     Some NAION patients lose complete vision with no recovery in affected eye(s).

---

[70]Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

[71] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION). Accessed February 18, 2025.

[72] Id.

[73] Id.

[74] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

100.    Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes results in bumps and falls and injuries related to the unseen impacts and accidents.

101.    GLP-1 receptors have been detected in neuronal cells in the human eye.[75]

102.    For example, clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on a different GLP-1 drug, Ozempic, led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

103.    The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide" authored by Hathaway *et al.* involved patients examined in the neuro-ophthalmology clinic between December 1, 2017 and November 30, 2023 and consisted of 17,298 patients including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D) and 979 were overweight or obese.[76]

104.    Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[77]

105.    Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[78]

---

[75] Hebsgaard JB, Pyke C, Yildirim E, Knudsen LB, Heegaard S, Kvist PH. Glucagon-like peptide-1 receptor expression in the human eye. *Diabetes Obes Metab*. 2018; **20**(9): 2304-2308. doi:10.1111/dom.13339
[76] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296
[77] *Id.*
[78] *Id.*

106.    Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[79]

107.    Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[80]

108.    The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[81]

109.    Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism in which semaglutide causes NAION, however, it was

---

[79] *Id.*
[80] *Id.*
[81] *Id.*

hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[82]

110. A metanalysis of all clinical trials of GLP-1 receptor drugs found a non-statistically increased risk of optic ischemic neuropathy.[83] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading a lower estimated risk.[84] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[85]

111. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[86]

112. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[87]

113. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling, and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to

---

[82] *Id.*

[83] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076

[84] *Id.*

[85] *Id.*

[86] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058

[87] *Id.*

start it again approximately two months later after which she then experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

114.    The same article includes reports of three patients who developed NAION following tirzepatide use.[88]

115.    The first case involved a man in his sixties reporting a painless shade in the superior field of his left eye after using tirzepatide injections for a year. He was diagnosed with NAION after thorough testing to rule out other conditions. [89]

116.    The second case involved a man in his sixties who experienced painless vision loss in his left eye upon awakening. He had been taking tirzepatide for a year when his dose was increased to 10 mg of tirzepatide weekly. His vision loss occurred 4 months after this dosage increase and he was diagnosed with NAION. [90]

117.    The third case involved a woman in her fifties who experienced painless vision loss in her left eye upon awakening 5 months after she started tirzepatide. She was diagnosed with NAION.[91]

118.    On August 11th, 2025 a cohort study was conducted and published in *JAMA*. This study aimed to determine if using semaglutide or tirzepatide was associated with an increased risk of NAION and other optic nerve or visual pathway disorders. [92]

---

[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] Wang, Lindsey, Volkow, MD, Nora D., Kaelber David C., MD, PhD, MPH, Xu, Rong PhD. Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes. *JAMA Ophthalmol*. Published online August 11, 2025. doi:10.1001/jamanetworkopen.2025.26327.

119.    The study was conducted with population of 159,398 patients with Type 2 diabetes, including 79,699 patients taking semaglutide or tirzepatide and a comparison group containing the same amount of patients taking other antidiabetic medications. [93]

120.    When researchers followed up with patients in two years, 35 patients (0.04%) who were taking semaglutide or tirzepatide developed NAION compared to 19 patients (0.02%) who developed NAION in the comparison group. The study found that treatment with semaglutide or tirzepatide was associated with an increased risk of optic nerve disorders, including NAION. [94]

121.    The medical community is continuing to study whether use of GLP-1 RA medications carry a heightened risk of NAION. As stated by the FDA, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, we aim to evaluate the previously observed safety signal with respect to NAION using a principled approach to study design and analysis," the agency has commissioned a non-randomized cohort study analyzing insurance claims data from the FDA Sentinel System's Real-World Evidence Data Enterprise (RWE-DE) Commercial Network (HealthVerity). [95]

122.    The study is ongoing and includes patients exposed to GLP-1RA medications indicated for treatment of Type 2 Diabetes, including Mounjaro. [96]

## V.    Defendant Continues to Fail to Disclose the Risk of NAION

123.    According to the Drugs@FDA website, the label for Trulicity has been updated on at least twenty-one (21) different occasions since 2014, with the most recent update on March 12, 2026. Despite this fact, Eli Lilly's labels have not contained any warning or any information

---

[93] *Id.*
[94] *Id.*
[95] https://www.sentinelinitiative.org/sites/default/files/documents/Risk-of-NAION-Following-GLP-1-Receptor-Agonist-Use-in-Patients-with-Type-2-Diabetes-Mellitus_v3.0_vF.pdf (last visited on Dec. 15, 2025)
[96] *Id.*

whatsoever on the increased propensity of Trulicity to cause NAION and permanent vision loss as suffered by Plaintiff. [97]

124.    CBEWTo date, the label is still devoid of any mention of NAION.

125.    Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Mounjaro, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact as to not risk the potential for injury in the other eye.

126.    Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the label.

127.    Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Trulicity's label without any prior FDA approval.

128.    Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

129.    Recently, the Third Circuit reaffirmed that plain text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal

---

[97] Drugs@FDA: FDA-Approved Drugs (last visited on Jun. 18, 2026)

(FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

130.    The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[98]

## PARTY PLAINTIFF

131.    Plaintiff DAPHNE FERRELL is a resident of the state of Mississippi and is currently 64 years old.

132.    On or around October 15, 2020 she consulted with a doctor at the Hope Center in Fairhope, Alabama to discuss options for treatment of her type 2 diabetes and weight loss.

133.    As a result of this appointment, on or around October 15, 2020, this doctor prescribed Ms. Ferrell Trulicity.

134.    On or around February of 2021, Ms. Ferrell started experiencing vision loss in her right eye.

135.    On or about February 18, 2021, Ms. Ferrell visited Dr. Joseph Harrell.. Dr. Harrell diagnosed plaintiff with NAION of the right eye.

---

[98] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

136.    On or around July of 2022, Ms. Ferrell started experiencing vision loss in her left eye.

137.    On or about July 18, 2022, Ms. Ferrell visited Dr. Anne Baranano, an ophthalmologist at The Retina Specialty Institute in Biloxi, Mississippi. Dr. Baranano diagnosed plaintiff with NAION of the left eye.

138.    On or about January 31, 2025, Ms. Ferrell visited Dr. Clayton Stevens, an ophthalmologist at Stevens Eye Care in Biloxi, Mississippi. Dr. Stevens diagnosed plaintiff with NAION of the left and right eyes.

139.    At the January 31, 2025 appointment, Dr. Stevens reported that Plaintiff's vision progressively worsened each time her Trulicity dose increased. He also recommended that Plaintiff consider changing the Trulicity.

140.    Ms. Ferrell no longer takes any GLP-1 RA medication to manage her Type II diabetes.

141.    Ms. Ferrell suffered a significant loss of visual acuity in her left and right eyes.

142.    Her eyesight loss is permanent.

143.    At all times material to the above, the Trulicity label failed to adequately warn Ms. Ferrell and her medical providers of the true risks of taking Trulicity.

144.    At all times material to the above, the marketing and advertising failed to adequately warn Ms. Ferrell and her medical providers of the true risks of taking Trulicity.

145.    Her life is forever changed because of her usage of Trulicity.

146.    Ms. Ferrell will never see clearly again as a result of her usage of Trulicity.

147.    Defendant knew or should have known that use of dulaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

24

148. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

149. Defendant's Trulicity was at all times utilized and prescribed in a manner foreseeable to Defendant.

150. Plaintiff used Trulicity, and did not misuse, or alter Trulicity in an unforeseeable manner.

151. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and her physicians the true and significant risks associated with this medication.

152. As a result of Defendant's actions, Plaintiff and her physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

153. As a direct result of being prescribed and using Trulicity, Plaintiff has been permanently and severely injured, having suffered serious consequences.

154. As a direct and proximate result of her Trulicity use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

155. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Trulicity was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

156. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Trulicity, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of her Type II diabetes and weight loss.

157. Plaintiff's life is forever changed as a result of Defendant's actions and inactions.

## COUNT I
## STRICT LIABILITY – FAILURE TO WARN
## (Pursuant to Applicable Product Liability Law)

158. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

159. Trulicity is a product within the meaning of Mississippi products liability law.

160. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

161. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

162. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Trulicity were inadequate.

163. Plaintiff did not have the same knowledge as Defendant and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

164. Defendant had a duty to provide adequate warnings and instructions for Trulicity, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

165. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Trulicity, as it became or could have become available to Defendant.

166. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Trulicity, to health care providers empowered to prescribe and dispense Trulicity to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Trulicity , which resulted in permanent injuries to Plaintiff.

167. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Trulicity created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

168. Despite the fact that Defendant knew or should have known that Trulicity caused unreasonable and dangerous side effects, it continues to promote and market Trulicity without providing adequate clinically relevant information.

169. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

170. The Trulicity supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Trulicity but, despite this knowledge and information, Defendant failed and neglected to issue adequate warnings that Trulicity causes serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Trulicity undergo ophthalmological monitoring.

171. Defendant's failure to provide adequate warnings or instructions rendered Trulicity unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

172. Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

173. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Trulicity including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

174. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

175.    Defendant continued to aggressively promote and sell Trulicity, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

176.    Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Trulicity, and/or that there existed safer and or equally effective alternative drug products that do not pose this same risk.

177.    By failing to adequately test and research harms associated with Trulicity, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Trulicity  and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Trulicity. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Trulicity and should or could be reported as an adverse event.

178.    The dulaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Trulicity, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote.

179.    Trulicity is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

180. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Trulicity could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

181. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II

### STRICT LIABILITY – DESIGN DEFECT
### Pursuant to Applicable Product Liability Law

182. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

183. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed these drugs into the stream of commerce in a defective and

unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

184.    Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

185.    Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

186.    Trulicity is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and was kept on the market despite being in a defective condition.

187.    Defendant knew or should have known the Trulicity they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

188.    Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

189.    Defendant sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

190.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Trulicity, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

191.    The Trulicity supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

192.    Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

193.    The Trulicity supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Trulicity makes the product unreasonably dangerous.

194.    Trulicity's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner.  It was more dangerous than Plaintiff expected.

195.    The intended or actual utility of Trulicity is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

196.    The design defects render Trulicity more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

32

197.    Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Trulicity created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

198.    Trulicity is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Trulicity use could result in vision issues, Defendant failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

199.    Defendant acted unreasonably in its design of Trulicity in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

200.    Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Trulicity's defective design.

201.    Trulicity is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

202.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III
## NEGLIGENT FAILURE TO WARN

203.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

204.    At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

205.    Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

206.    Trulicity was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

207.    Defendant owed Plaintiff and other Trulicity users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Trulicity.

208.    At all times material, Trulicity  was used in a manner intended and/or foreseeable to Defendant.

34

209. A reasonable patient or consumer of Trulicity would expect the drug to be free of significant defects.

210. Defendant knew or had reason to know of facts establishing that Trulicity could cause NAION and failed to warn of the risk.

211. At all times relevant hereto, the defective nature of Trulicity was known to Defendant, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Trulicity, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

212. In disregard of its duty to timely warn consumers of health risks associated with Trulicity, Defendant committed one or more of the following negligent acts or omissions:

    a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Trulicity was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

    b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

    c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monioring was necessary.

213. At all relevant times, the label for Trulicity was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

214. At all relevant times, the label for Trulicity was inadequate because it did not warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including NAION.

215. The labels for Trulicity were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Trulicity.

216.    Defendant's failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

217.    Defendant's failure to warn of the significant risks of Trulicity use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Trulicity.

218.    Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Trulicity, Plaintiff would not have elected to begin and/or continue Trulicity.

219.    Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

220.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IV**
**<u>NEGLIGENCE</u>**

221.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

36

222.    At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

223.    Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

224.    At all relevant times, Defendant had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Trulicity products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

225.    Defendant failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Trulicity in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

226.    Defendant had no reason to believe that intended and foreseeable users of Trulicity such as Plaintiff, would realize the potential harm from use of these products.

227.    Defendant failed to exercise reasonable care to inform users, such as Plaintiff, of Trulicity's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

228.    Defendant breached its duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Trulicity.

229.   In disregard of its duty, Defendant committed one or more of the following negligent acts or omissions:

a.   Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Trulicity without thorough and adequate pre- and post-market testing of the products;

b.   Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Trulicity while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Trulicity;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Trulicity was safe for their intended use;

d.   Failing to disclose and warn of the product defect to the medical community, and consumers that Defendant knew and had reason to know that Trulicity was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e.   Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Trulicity's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Trulicity;

g.   Advertising, marketing, and recommending the use of Trulicity, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of this product;

h.   Representing that Trulicity was safe for their intended use when in fact Defendant knew and should have known the product were not safe for their intended purpose;

i.   Continuing to manufacture and sell Trulicity with the knowledge that Trulicity is unreasonably unsafe and dangerous;

j.   Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Trulicity so as to avoid the risk of serious harm associated with the use of dulaglutide. Failing to design and manufacture Trulicity so as to ensure these drugs were at least as safe and

effective as other similar products;

k.    Failing to design and manufacture Trulicity was reasonably safe for their intended purpose in violation of objective safety standards;

l.    Failing to ensure that Trulicity was accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m.    Failing to ensure that Truliicty was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Trulicity and that use of tirzepatide created a high risk of severe, permanent injuries to vision; and

n.    Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Trulicity.

230.    A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

231.    As a direct and proximate result of the Defendant's negligent testing, monitoring, and pharmacovigilance of Trulicity, Defendant introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

232.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V
## NEGLIGENT MISREPRESENTATION AND MARKETING

233. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

234. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

235. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

236. At all relevant times, Defendant negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Trulicity, including, but not limited to, misrepresentations regarding the safety and known risks of Trulicity.

237. The information distributed by the Defendant to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Trulicity.

238.    Defendant's conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Trulicity and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Trulicity.

239.    Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Trulicity and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Trulicity.

240.    Defendant had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Trulicity, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

241.    Defendant made continued omissions in the Trulicity labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

242.    Defendant made additional misrepresentations beyond the product labeling by representing Trulicity as a safe and effective treatment for type 2 diabetes and/or weight loss with only minimal risks.

243.    Defendant misrepresented and overstated the benefits of Trulicity to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

244.    In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Trulicity, thereby causing Plaintiff to endure severe and permanent injuries.

245.    In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Trulicity use before it was too late. Defendant knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendant.

246.    Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Trulicity had the true facts not been concealed by the Defendant.

247.    Defendant had sole access to many of the material facts concerning the defective nature of Trulicity and its propensity to cause serious and dangerous side effects.

248.    At the time Plaintiff was prescribed and administered Trulicity, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations and omissions.

249.    The Defendant failed to exercise ordinary care in making representations concerning Trulicity while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendant negligently misrepresented Trulicity's risk of unreasonable and dangerous adverse side effects.

250. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendant, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Trulicity.

251. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

252. As a direct and proximate result of reliance upon Defendant's negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

253. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

254. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

255.    Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

256.    Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Trulicity was safe, effective, fit and proper for their intended use.

257.    Trulicity materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Trulicity, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Trulicity sold to Plaintiff.

258.    Defendant expressly warranted that Trulicity was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Trulicity was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

259.    Trulicity does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

260.    Plaintiff and Plaintiff's physicians justifiably relied on Defendant's representations regarding the safety of Trulicity, and Defendant's representations became part of the basis of the bargain.

261.    Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's

44

representations that Trulicity was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

262.    Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Trulicity over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

263.    Plaintiff purchased and used Trulicity without knowing that drug is not safe and well-tolerated, but that Trulicity instead causes significant and irreparable vision loss and eye damage.

264.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

265.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

45

266. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

267. Defendant, as the holder of NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

268. Defendant was the seller of Trulicity, which was to be taken for treatment of type 2 diabetes and weight loss.

269. When Trulicity was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

270. Defendant impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

271. Defendant breached their implied warranties of the Trulicity product because the Trulicity sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

272. Trulicity would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

273. Defendant's breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk

46

and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VIII
## VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
## MISS. CODE ANN. § 75-24-5(1).

274.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

275.    Plaintiff purchased and used Trulicity primarily for personal use and therefore suffered ascertainable losses as a result of Defendant's actions in violation of Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5(1).

276.    Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Trulicity and would not have incurred damages.

277.    Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

278.    Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Trulicity.

279.    Defendant intended such actions to mislead patients, healthcare providers, and the

general public with respect to the safety and efficacy of Trulicity.

280.    Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Trulicity.

281.    Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Trulicity.

282.    Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Ms. Ferrell's constituted unfair and deceptive acts and trade practices in violation of Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5(1).

283.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Trulicity, DAPHNE FERRELL suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IX
## PUNITIVE DAMAGES

284.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

48

285.    The acts and omissions of Defendant described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendant's officers, directors, and/or managing agents.

286.    Defendant's actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

287.    Defendant sold Trulicity to Plaintiff and other consumers throughout the United States despite their knowledge that Trulicity can cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

288.    Defendant misled both the medical community and the public, including Plaintiff and her physicians, by making false representations about the safety and effectiveness of Trulicity and by failing to provide adequate instructions concerning its use.

289.    Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Trulicity despite available information demonstrating that drug could cause NAION and irreversible vision loss.

290.    Defendant was or should have been in possession of evidence demonstrating that Trulicity use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Trulicity by providing false and misleading information with regard to their safety and effectiveness.

291.    Defendant failed to provide warnings that would have dissuaded health care professionals from using Trulicity, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Trulicity.

292.    As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed

49

with NAION and suffers from irreparable vision loss due to Plaintiff's use of Trulicity.

293.    As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

294.    Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

295.    Defendant have engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles and the statutory provisions of Mississippi law.

296.    Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

297.    Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

298.    Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

299.    Consequently, Defendant are liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against the Defendant, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

300.    Defendant is estopped from relying on the statute of limitations defense because Defendant actively concealed information concerning known risks, side effects, and defects in Trulicity. Instead of revealing such information to the FDA or the public, Defendant has continued to represent Trulicity as safe for its intended use.

301.    Defendant is and was under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Trulicity. Because of Defendant's purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendant is estopped from relying on any statute of limitations defense.

## DEMAND FOR JURY TRIAL

302.     Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendant awarding the following:

1.     A monetary award, sufficient to compensate Plaintiff for the following categories of damages:

    a.     actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b.     actual and treble damages in such amount to be determined by this Court and as provided by law;

    c.     exemplary and punitive damages sufficient to punish and deter Defendant and others from future wrongful practices;

    d.     pre-judgment and post-judgment interest;

    e.     costs including court costs, and other litigation expenses; and

    f.     any other relief the Court may deem just and proper.

Dated: June 25, 2026                    Respectfully Submitted,

                                                */s/ Jason Goldstein*
                                                Jason S. Goldstein, Esq.
                                                  Attorney I.D. No. 334857
                                                **PARKER WAICHMAN LLP**
                                                  6 Harbor Park Drive
                                                Port Washington, New York 11050
                                                (516) 466-6500
                                                (516) 466-6665
                                                jgoldstein@yourlawyer.com


                                                *Attorney for Plaintiff*